UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ALEXSANDR ROYTMAN,

                            Plaintiff,

                                                **MEMORANDUM & ORDER**
            - against -                         19-CV-3626 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Alexsandr Roytman brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

seeking judicial review of the decision of the Commissioner of the Social Security Administration

("SSA") denying Plaintiff's claim for Social Security Supplemental Security Income ("SSI").

Before the Court are the parties' cross-motions for judgment on the pleadings.  (Dkts. 9, 13.)

Plaintiff seeks an order remanding this matter for further administrative proceedings, and the

Commissioner asks the Court to affirm the denial of Plaintiff's claim.  For the reasons that follow,

the Court grants Plaintiff's motion on the pleadings and denies the Commissioner's cross-motion.

This case is remanded for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I.    Procedural History

On April 18, 2016, Plaintiff filed an application for SSI, alleging disability beginning on

January 1, 2012 (Administrative Transcript ("Tr."),[1] Dkt. 8, at 253, 395), though later amending

his alleged onset date to the date his application was filed (*see id.* at 211, 223; Memorandum of

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."), Dkt. 9-1, at 1 n.1;

Memorandum of Law in Support of the Defendant's Cross-Motion for Judgment on the Pleadings,

Dkt. 14, at 3). On June 14, 2016, Plaintiff's application was initially denied. (Tr. at 265–70.) On

July 19, 2016, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ").

(*Id.* at 276–78.) On June 5 and September 7, 2018, Plaintiff appeared with counsel before ALJ

Martha Reeves. (*Id.* at 208–19, 220–52.) In a decision dated September 25, 2018, the ALJ

determined that Plaintiff was not disabled under the Social Security Act (the "Act") and was not

eligible for SSI. (*Id.* at 25–42.) On April 22, 2019, the ALJ's decision became final when the

Appeals Council of the SSA's Office of Appellate Operations denied Plaintiff's request for review

of the ALJ decision. (*Id.* at 1–6.) Thereafter, Plaintiff timely[2] commenced this action.

## II.     The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant

bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden

in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines

---

[2] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security
> made after a hearing to which he was a party . . . may obtain a review of such
> decision by a civil action commenced within sixty days after the mailing to him of
> notice of such decision or within such further time as the Commissioner of Social
> Security may allow.

42. U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is
presumed received five days after it is dated unless the claimant makes a reasonable showing to
the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at
*3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard,
the Court determines that Plaintiff received the Commissioner's final decision on April 27, 2019,
and that, because Plaintiff filed the instant action on June 20, 2019—54 days later—it is timely.
(*See generally* Complaint, Dkt. 1.)

whether the claimant is currently engaged in "substantial gainful activity."   20 C.F.R. § 404.1520(a)(4)(i).  If the answer is yes, the claimant is not disabled.  If the answer is no, the ALJ proceeds to the second step to determine whether the claimant suffers from a severe impairment. *Id.* § 404.1520(a)(4)(ii).  An impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Id.* § 404.1520(c).  If the impairment is not severe, then the claimant is not disabled.  However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings").  *Id.* § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1.  If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act.  On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC") before continuing with steps four and five.  To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in a work setting."  *Id.* § 404.1545(a)(1).  The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work.   *Id.* § 404.1520(a)(4)(iv).   If the answer is yes, the claimant is not disabled.  Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. *Id.* § 404.1520(a)(4)(v).  If the answer is yes, the claimant is not disabled; otherwise the claimant is disabled and entitled to benefits.  *Id.*

In this case, the ALJ found that Plaintiff has not engaged in substantial gainful activity since April 18, 2016, his alleged onset date, but noted that "earnings records do not show any

income after 2006." (Tr., Dkt. 8, at 30.)  The ALJ proceeded to the second step and found that

Plaintiff suffers from the following severe impairments: "schizophrenia,[3] bipolar disorder[4] with

psychotic features, mood disorder[5] with psychosis,[6] and anxiety." (*Id.* (citation omitted).)  The

ALJ then progressed to the third step and determined that Plaintiff "[did] not have an impairment

or combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 CFR Part 404, Subpart I, Appendix 1 (20 CFR 416.920(d), 416.925 and

416.926)." (*Id.* at 31.)

        Moving to the fourth step, the ALJ found that Plaintiff maintained the RFC

to perform a full range of work at all exertional levels[7] but with the following non-
exertional limitations.  He can perform short, simple, routine tasks and can make

---

[3] "Schizophrenia is a serious mental disorder in which people interpret reality abnormally. [It] may result in some combination of hallucinations, delusions, and extremely disordered thinking and behavior that impairs daily functioning, and can be disabling." *Schizophrenia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/schizophrenia/symptoms-causes/syc-20354443 (last visited Sept. 27, 2020).

[4] "Bipolar disorder, formerly called manic depression, is a mental health condition that causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression)." *Bipolar disorder*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955 (last visited Sept. 27, 2020). "In some cases [of Bipolar disorder], mania may trigger a break from reality (psychosis)." *Id.*

[5] "A mood disorder is a mental health class that health professionals use to broadly describe all types of depression and bipolar disorders." *Mood Disorders*, JOHNS HOPKINS: HEALTH, https://www.hopkinsmedicine.org/health/conditions-and-diseases/mood-disorders (last visited Sept. 27, 2020).

[6] "Psychosis is characterized by an impaired relationship with reality. It [is] a symptom of serious mental disorders.  People who are experiencing psychosis may have either hallucinations or delusions." *Psychosis*, HEALTHLINE, https://www.healthline.com/health/psychosis (last visited Sept. 27, 2020).

[7] According to the applicable regulations, jobs are classified as "sedentary, light, medium, heavy, and very heavy." 20 C.F.R. § 404.1567.  In stating that Plaintiff could perform "a full range of work at all exertional levels," the Court therefore assumes that the ALJ found Plaintiff capable of performing

> simple decisions and respond to workplace changes.  He can never have exposure
> to strict deadlines or high-production requirements.  He can relate adequately with
> others, but can never interact with the public.  He will be off-task at least five
> percent of the workday.

(*Id.* at 32–33.)

The ALJ found that Plaintiff had no past relevant work, but that, based on Plaintiff's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform," such as photo copy and machine operator, or marker.  (*Id.* at 41–42.)  The ALJ accordingly concluded that Plaintiff was not disabled.  (*Id.* at 42.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits.  42 U.S.C. § 405(g).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera*, 697 F.3d at 151 (internal quotations omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotations, alterations, and citation omitted).  In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which

---

> [v]ery heavy work[, which] involves lifting objects weighing more than 100 pounds
> at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
> If someone can do very heavy work, we determine that he or she can also do heavy,
> medium, light and sedentary work.

*Id.* § 404.1567(e).

conflicting inferences can be drawn." *Id.* (internal quotation omitted).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (noting that "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of [the] ALJ's decision" (internal quotation omitted)).  Ultimately, the reviewing court "defer[s] to the Commissioner's resolution of conflicting evidence[,]" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted), and, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld[,]" *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

## DISCUSSION

Plaintiff argues that the ALJ failed to appropriately weigh the medical opinion evidence, and properly evaluate Plaintiff's testimony.  (Pl.'s Mem., Dkt. 9-1, at 14–24.)  The Court agrees, and addresses Plaintiff's arguments according to the ALJ's requisite five-step inquiry.

## I.      The ALJ's Decision at Step Three

At step three of the inquiry, the ALJ considers whether any severe impairment suffered by the plaintiff meets or equals the severity of an impairment in the Listings.  20 C.F.R. § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1.  Each Listing sets out "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  A plaintiff seeking to establish that her impairments meet or equal the severity of an impairment in the Listings must establish that she "satisfies all of the criteria of that listing, including any relevant criteria in the introduction."  *Id.* § 404.1525(c)(3); *accord Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("[A]n impairment that manifests only some

6

of those criteria, no matter how severely, does not qualify.").  An ALJ is not necessarily required to set out why a plaintiff has not met the requirements of a Listing so long as "other portions of the ALJ's decision and the evidence before [her] indicate that [her] conclusion was supported by substantial evidence." *McIntosh v. Berryhill*, No. 17-CV-5403 (ER) (DF), 2018 WL 4376417, at *22 (S.D.N.Y. July 16, 2018) (quoting *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)).  A plaintiff bears the burden to "demonstrate that [her] disability [meets] all of the specified medical criteria of a [] disorder." *Id.* at *18 (second alteration in original) (quoting *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (summary order)).

### A.  Listings 12.03, 12.04, 12.06, and 12.08 – Mental Impairments

Listings 12.03, 12.04, and 12.06 require medical documentation of the relevant impairment pursuant to each Listing's paragraph A, and the fulfilment of the criteria under each Listing's paragraph B or paragraph C.  Listing 12.08 requires medical documentation pursuant to its paragraph A, and the fulfilment of the criteria under its paragraph B.  The ALJ found that "[Plaintiff]'s mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, 12.06, or 12.08" because Plaintiff did not satisfy the Listings' paragraph B or paragraph C criteria.  (Tr., Dkt. 8, at 31–32.)

Listing 12.03 applies to schizophrenia spectrum and other disorders, and its paragraph A requires medical documentation of one of the following: delusions or hallucinations; disorganized thinking (speech); or grossly disorganized behavior or catatonia.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.03, 12.03(A).  Listing 12.04 applies to depressive, bipolar, and other related disorders.  *See id.* pt. 404, subpt. P, app. 1, sec. 12.04.  As relevant to bipolar disorders, paragraph A of Listing 12.04 requires medical documentation of three or more of the following: pressured speech; flight of ideas; inflated self-esteem; decreased need for sleep; distractibility; involvement

7

in activities that have a high probability of painful consequences that are not recognized; or an increase in goal-directed activity or psychomotor agitation. *Id.* pt. 404, subpt. P, app. 1, sec. 12.04(A)(2). Listing 12.06 applies to anxiety and obsessive-compulsive disorders. *See id.* pt. 404, subpt. P, app. 1, sec. 12.06. As relevant to anxiety disorder, paragraph A of Listing 12.06 requires medical documentation of three or more of the following: restlessness; being easily fatigued; difficulty concentrating; irritability; muscle tension; or sleep disturbance. *See id.* pt. 404, subpt. P, app. 1, sec. 12.06(A)(1). Listing 12.08 applies to personality and impulse-control disorders, and its paragraph A requires medical documentation of one of the following: distrust and suspiciousness of others; detachment from social relationships; disregard for and violation of the rights of others; instability of interpersonal relationships; excessive emotionality and attention seeking; feelings of inadequacy; excessive need to be taken care of; preoccupation with perfectionism and orderliness; or recurrent, impulsive, aggressive behavioral outbursts. *See id.* pt. 404, subpt. P, app. 1, sec. 12.08(A).

Paragraph B of Listings 12.03, 12.04, 12.06, and 12.08 require the demonstration of extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *See id.* pt. 404, subpt. P, app. 1, sec. 12.03(B), 12.04(B), 12.06(B), 12.08(B) (internal cross-references omitted). Paragraph C of Listings 12.03, 12.04, and 12.06 require the demonstration of a mental disorder that is serious and persistent—that is, a medically documented history of the existence of the disorder over a period of at least 2 years—and

> evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [his] mental disorder; and (2) marginal adjustment, that is,

8

[he has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life.

*Id*. pt. 404, subpt. P, app. 1, sec. 12.03(C), 12.04(C), 12.06(C) (internal cross-references omitted).

### B. The ALJ's Step-Three Analysis

Skipping over any paragraph A analysis, the ALJ reviewed the paragraph B criteria and determined that Plaintiff had only moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  (Tr., Dkt. 8, at 31–32.)  In light of this finding that none of Plaintiff's impairments "cause[d] at least two 'marked' limitations or one 'extreme' limitation" in those areas, the ALJ concluded that the paragraph B criteria were not satisfied as to any mental impairment in Listings 12.03, 12.04, 12.06, and 12.08.  (*Id.* at 32.)  In so reasoning, the ALJ cited the June 6, 2016 psychiatric evaluation of consultative examiner ("CE") W. Amory Carr, Ph.D (*id.* at 979–82),[8] "clinical observations . . . from treating sources," and Plaintiff's daily activities, as purportedly indicated in the record.  (*Id.* at 31–32.)

As to the paragraph C criteria, the ALJ found that

[t]he record does not establish that [Plaintiff] has only marginal adjustment, that is, a minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life. . . .  [Plaintiff] is able to function independently, including caring for his daily needs as noted [in the paragraph B analysis].  The [ALJ] [also] note[d] that [Plaintiff] has been able to keep up with his changing psychiatric condition via making and keeping the appropriate psychiatric appointments in the medical evidence of record, and that he expressed a desire to take on new demands inherent in working and volunteering.

(*Id.* at 32.)

---

[8] CE Carr examined Plaintiff only once, on June 2, 2016.  (Tr., Dkt. 8, at 979–82.)

**C.  The ALJ's Step-Three Determination Warrants Remand**

Remand is appropriate with respect to an ALJ's "rationale in support of [her] decision to find or not to find a listed impairment" if the district court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 483 (S.D.N.Y. 2018) (quoting *Berry*, 675 F.2d at 469) (collecting cases); *see also Rivera v. Astrue*, No. 10-CV-4324 (RJD), 2012 WL 3614323, at *11–12 (E.D.N.Y. Aug. 21, 2012) (remanding for further administrative proceedings where the ALJ failed to proffer a specific rationale for the plaintiff not having met the Listing requirements, and where the ALJ's rationale was not evident from the balance of the evidence).

Here, the Court is "unable to fathom the ALJ's rationale in relation to the record," *cf. Rivera*, 2012 WL 3614323, at *11 (citation omitted), regarding the ALJ's determination of the severity of Plaintiff's schizophrenic, bipolar, mood, and anxiety disorders.  In concluding that the severity of these disorders did not satisfy the paragraph B criteria, the ALJ cited to Plaintiff's treatment notes and evaluation by CE Carr, but not to the opinions of Plaintiff's treating psychiatrist, Dr. Tatyana Poblaguyev, M.D. (Tr., Dkt. 8, at 31–32), as set forth in two letters she submitted on December 12, 2016 and May 2, 2018 (*id.* at 1361–63, 1371–72, 1796), and a Psychiatric/Psychological Impairment Questionnaire she submitted on May 25, 2018 (*id.* at 1373–77, 1798–1803).  In the Psychiatric/Psychological Impairment Questionnaire, Dr. Poblaguyev diagnosed Plaintiff with chronic paranoid schizophrenia with acute exacerbation and the psychosocial factors of auditory and visual hallucinations and paranoid delusion.  (*Id.* at 1373.) Dr. Poblaguyev noted that Plaintiff had required multiple hospitalizations in the past for his symptoms.  (*Id.*)  The doctor also wrote that Plaintiff was taking the following medications: Invega

Sustenna (injection), Wellbutrin XL, Cogentin, and Hydroxyzine. (*Id.*) With respect to the paragraph B criteria, Dr. Poblaguyev indicated that Plaintiff had marked limitations in several work-related activities with respect to three of the four categories[9] of mental functioning: concentration and persistence[10]; social interactions[11]; and adaptation.[12] (*Id.* at 1376.)

However, despite Dr. Poblaguyev's assessment, the ALJ instead referred to the psychiatric evaluation of CE Carr, who found that Plaintiff had only moderate limitations in "follow[ing] and understand[ing] simple directions and instructions"; moderate-to-marked limitations in maintaining a regular schedule; moderate limitations in learning new tasks; marked limitations in performing complex tasks; marked limitations in making appropriate decisions; moderate-to-marked limitations in relating adequately to others; and moderate-to-marked limitations in appropriately dealing with stress. (*Id.* at 981.) But, despite citing to CE Carr's assessment, the ALJ ignored CE Carr's findings that Plaintiff had moderate-to-marked limitations in maintaining a regular schedule, relating adequately to others, and appropriately dealing with stress, and marked limitations in performing complex tasks and making appropriate decisions. Instead, the ALJ relied on CE Carr's noted observations to independently conclude that Plaintiff had only moderate limitations in each of the four paragraph B criteria.

---

[9] Dr. Poblaguyev indicated that Plaintiff had one moderate, one moderate-to-marked, and one marked limitation in the fourth category, understanding and memory. (*See* Tr., Dkt. 8, at 1376.)

[10] Dr. Poblaguyev indicated that Plaintiff had marked limitations in seven of the nine work-related activities in this category. (*See* Tr., Dkt. 8, at 1376.)

[11] Dr. Poblaguyev indicated that Plaintiff had marked limitations in four of the six work-related activities in this category. (*See* Tr., Dkt. 8, at 1376.)

[12] Dr. Poblaguyev indicated that Plaintiff had marked limitations in two of the five work-related activities in this category. (*See* Tr., Dkt. 8, at 1376.)

For example, in concluding that Plaintiff had only moderate limitations in understanding, remembering, or applying information, the ALJ relied on CE Carr's observation "that [Plaintiff] was able to repeat three out of three objects immediately, recall three out of three objects after five minutes, and repeat five digits forward," and then opined that Plaintiff's "thought processes were coherent and goal-directed, and his insight and judgment were fair." (*Id.* at 31.) The ALJ also concluded that Plaintiff's clinical treatment notes "included thought processes that were goal oriented and did not include difficulties with memory." (*Id.*) In finding that Plaintiff had only a moderate limitation in interacting with others, the ALJ relied on CE Carr's observation that Plaintiff had "cooperative and adequately related." (*Id.* (record citation omitted).) She also noted, without citing, that other medical records indicated that Plaintiff "presented as cooperative and related well with staff," that he "[got] along with his mother and ha[d] been able to work out in the gym," and that his "medication regimen alleviates symptoms when he is compliant with it." (*Id.*) In finding that Plaintiff had only a moderate limitation in concentrating, persisting, or maintaining pace, the ALJ relied on CE Carr's observation that Plaintiff could "complete simple calculations and made no errors in completing the serial threes task." (*Id.* at 32.) Finally, in finding that Plaintiff had only a moderate limitation in adapting or managing himself, the ALJ relied on Plaintiff's daily activities of reading, watching television, and spending time with his family, as well as his expressed interest in finding a job. (*Id.*)

The Court cannot find that the ALJ's step-three rationale is supported by substantial evidence, especially in light of the medical opinion and other evidence to the contrary. As discussed *supra*, Dr. Poblaguyev found that Plaintiff had marked limitations in several work-related activities relating to three of the four paragraph B categories, *i.e.*, concentration and persistence, social interactions, and adaptation. Significantly, Plaintiff's treatment records are

12

consistent with Dr. Poblaguyev's opinion with regard to these limitations.  On May 17, 2016, Dr. Poblaguyev diagnosed Plaintiff primarily with "bipolar disorder, current episode mixed, severe, with psychotic features."  (*Id.* at 1325.)  Plaintiff reported deterioration with his condition, and was more "anxious, ha[d] mood swings between depression and irritability, developed insomnia and sle[pt] only [three to four hours per night] for the last two weeks."  (*Id.*)  Dr. Poblaguyev increased Plaintiff's doses of Risperdal for mood stabilization and Hydroxyzine for insomnia and anxiety.  (*Id.*)  On May 28, 2016, Dr. Poblaguyev reported that Plaintiff had overt psychotic symptoms, though his impulse control and insight were fair.  (*Id.* at 1324.)  Plaintiff was continued on Risperdal, Cogentin, Lexapro, and Hydroxyzine.  (*Id.*)  On June 20, 2016, Plaintiff again reported deterioration in his condition accompanied by increased mood swings, irritability, severe insomnia, increased depression and anxiety, and poor focus.  (*Id.* at 1442.)  Dr. Poblaguyev observed that Plaintiff was "not able to function and accomplish tasks.  Plaintiff [also] reported some paranoid preoccupation, but denied fixed delusions."  (*Id.* at 1443.)  Plaintiff again agreed to increase his Risperdal medication for mood stabilization, and started on Trileptal.  (*Id.* at 1442–43.)  Dr. Poblaguyev suggested that Plaintiff consider taking injectable medication like Invega Susstenna or Risperdal Consta, but Plaintiff responded that he was not ready for them.  (*Id.* at 1443.)  On August 2, 2016, Plaintiff reported that he was depressed, and occasionally cried.  (*Id.* at 1444.)  On August 31, 2016, Plaintiff denied major mood swings, but had insomnia even with his medication.  (*Id.* at 1446.)  On October 14, 2016, Plaintiff reported experiencing anxiety and depression even with medication.  (*Id.* at 1448.)  Plaintiff reported doing better on December 12, 2016 (*id.* at 1450), but, as Dr. Poblaguyev noted in her December 12, 2016 letter, Plaintiff had frequent mood swings and psychotic symptoms despite regular follow-ups and medication (*id.* at 1361).  Dr. Poblaguyev also noted Plaintiff's difficulty in focusing and completing tasks.  (*Id.*)  On

March 30, 2017, Plaintiff stated at a consultation that he was hearing voices, having thoughts about hurting himself, and that he had stopped taking his medication because it was not working.  (*Id.* at 1473.)

As to the symptoms of Plaintiff's schizophrenic disorder, the record contains many references to Plaintiff's auditory and visual hallucinations starting in 2013.  (*See, e.g.*, *id.* at 513, 1472, 1510–14, 1520, 1527.)  On September 5, 2014, treatment notes indicate that, "as per EMS[,] [Plaintiff] walked into [a police] precinct and stated: 'God told me to kill and rape 11 people.'" (*Id.* at 717; *see also id.* at 718 (noting Plaintiff's reports of hearing voices from the Devil).)  On October 17, 2014, treatment notes indicate that Plaintiff reported hearing voices "telling him to go to the police and tell them he committed a crime."  (*Id.* at 761 (referring Plaintiff to the psychiatric emergency room for "evaluation and observation," noting that "he is [] too unstable to go home"); *see also id.* at 784–85.)  Plaintiff was hospitalized in April 2012 and September 2014 (*id.* at 1363), from March 30, 2017 until April 6, 2017 (*id.* at 1364), and again from February 6, 2018 to February 12, 2018 (*id.* at 1541–67, 1618).  Prior to the February 2018 hospitalization, Plaintiff reported "exacerbated auditory hallucinations with voices making derogatory/[threatening] comments and telling him that he's 'going to hell[,]' [and] report[ed] visions, like 'fires burning.'" (*Id.* at 1575; *see also* 1752.)  Dr. Poblaguyev noted that Plaintiff had previously attempted suicide, and had been hospitalized in April 2012 and September 2014 for, *inter alia*, auditory hallucinations, including derogatory commands.  (*Id.* at 1363.)  Indeed, CE Carr's opinion regarding Plaintiff's marked limitations in certain areas—which the ALJ chose to disregard—is largely consistent with Dr. Poblguyev's treatment notes and opinion.

In light of the evidence in the record consistent with the marked limitations found by Dr. Poblaguyev and CE Carr, the ALJ cannot substitute her own opinion for that of the medical

14

professionals. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[I]t is well-settled that 'the ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion.'" (quoting *McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983))).[13]  "[T]he record evidence suggests that Plaintiff's symptoms *could* meet the Listing requirements," and the Court is thus "unable to assess whether the ALJ's decision is supported by substantial evidence." *Perozzi*, 287 F. Supp. 3d at 483 (emphasis added) (citation omitted); *accord Duran v. Colvin*, No. 14-CV-8677 (HBP), 2016 WL 5369481, at *17 (S.D.N.Y. Sept. 26, 2016) (remanding where the ALJ at step three "failed to fully address the medical evidence that potentially meets the listing requirements"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507–08 (S.D.N.Y. 2014) (finding remand appropriate where there was insufficient uncontradicted evidence in the record to support the ALJ's rationale at step three); *Norman v. Astrue*, 912 F. Supp. 2d 33, 41 (S.D.N.Y. 2012) (remanding because "of the ALJ's failure to explain his reasoning and the conflicting medical evidence in the record," as a result of which the court could not "conclude by looking at sufficient uncontradicted evidence that the ALJ's decision was supported by substantial evidence" (internal quotation and citation omitted)).

---

[13] Nor should the ALJ base her determination that Plaintiff's limitations were only moderate solely on notes in the record indicating, for example, that Plaintiff had some success in laboratory tests like "repeat[ing] five digits forward." (*See* Tr., Dkt. 8, at 31.)  Relying on the assessment of the psychiatrist that treated Plaintiff many times across several years is particularly important in the context of schizophrenia, "[c]linical manifestations of [which] are diverse and can change over time . . . [.]  [While] many symptoms are obvious, such as hallucinations, others such as affective blunting or incongruity are relatively subtle and can be easily missed by a casual observer." *Johnson v. Astrue*, 493 F. Supp. 2d 652, 660 (W.D.N.Y. 2007) (quoting The American Psychiatric Publishing Textbook of Clinical Psychiatry, ch. 9 (Robert E. Hales & Stuart C. Yudofsky eds., 4th ed. 2002)) (ellipsis in original).  The same holds true for Plaintiff's bipolar disorder, which, "[b]ecause of its complexity, [] can be difficult to diagnose." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 260 (N.D.N.Y. 2010) (quoting *In re Zyprexa Prods. Liability Litig.*, 253 F.R.D. 69, 98 (E.D.N.Y. 2008)).

Here, the ALJ's failure at step three to "fully address the medical evidence that potentially meets the listing requirements" requires remand.  *Duran*, 2016 WL 5369481, at *17.  By completely ignoring the assessment of treating psychiatrist Dr. Poblaguyev and selectively relying on the assessment of CE Carr,[14] the ALJ substituted her own judgment for that of medical professionals.  *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) (finding remand warranted where the ALJ "ignore[d] parts of the record that are probative of the [plaintiff's] disability claim") (collecting cases).  Though ALJs are not required to set forth why a plaintiff's impairments do not meet the requirements of the Listings if "other portions of the [] decision and the evidence before [the ALJ] indicate that [her] conclusion was supported by substantial evidence," *McIntosh*, 2018 WL 4376417, at *22 (quoting *Berry*, 675 F.2d at 468), for the reasons discussed next, the Court finds that neither the other portions of the ALJ's decision here, nor the record before the ALJ, support her step-three rationale or conclusion that Plaintiff's mental impairments did not meet the Listings.

---

[14] On remand, the ALJ should give priority to the assessment of Dr. Poblaguyev over that of CE Carr, given courts' general admonition that "a consulting physician's opinions or report should be given limited weight."  *Adesina v. Astrue*, No. 12-CV-3184 (WFK), 2014 WL 5380938, at *9 (E.D.N.Y. Oct. 22, 2014) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)); *see also Cruz*, 912 F.2d at 13 ("This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." (internal quotation and citation omitted)); *Selian*, 708 F.3d at 419 (noting general rule that "ALJs should not rely heavily on the findings of consultative physicians after a single examination" (citation omitted)).  However, an ALJ "may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence."  *Mayor v. Colvin*, No. 15-CV-344 (AJP), 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015) (collecting cases).  An ALJ giving greater weight to a consultative examiner's opinion should document her rationale for finding that the relevant standards are met.  *See Suarez v. Colvin*, 102 F. Supp. 3d 552, 577–78 (S.D.N.Y. 2015).  Notably, CE Carr's opinion was dated June 2, 2016 (*see* Tr., Dkt. 8, at 979), prior to Plaintiff's 2017 and 2018 hospitalizations, and Dr. Poblaguyev's opinions.

## II.      The ALJ's RFC Determination

Related to the ALJ's improper step-three assessment of Plaintiff's mental health limitations, the ALJ also failed to accord appropriate weight to the opinions of Dr. Poblaguyev, Plaintiff's treating psychiatrist.

### A.  Treating Physician Rule

"With respect to the nature and severity of a claimant's impairments, the SSA recognizes a treating physician rule[15] of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation, alterations, and citations omitted).  Under the treating physician rule, a treating source's opinion is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 416.927(c)(2).  If the opinion of the treating physician is not given controlling weight, the ALJ must apply a number of factors in order to determine the opinion's proper weight.  *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  These factors include: (i) the frequency of examination as well as the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating source's opinion; (iii) the extent to which the opinion is consistent with the record as a whole; (iv) whether the treating source is a specialist; and (v) other relevant factors.  *See* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6).

As discussed above, Plaintiff's records include therapy and psychiatry treatment notes, two letters, and a Psychiatric/Psychological Impairment Questionnaire, all by Plaintiff's treating

---

[15] Although "[t]he current version of the [Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, as the current regulations apply only "to cases filed on or after March 27, 2017."  *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520(c).  Because Plaintiff's claim was filed on February 17, 2015, the treating physician rule applies.

psychiatrist, Dr. Poblaguyev.  In her December 12, 2016 letter, Dr. Poblaguyev noted that Plaintiff

had been under her psychiatric care since March 2015.  (Tr., Dkt. 8, at 1361.)  She explained that

Plaintiff "suffer[ed] from bipolar disorder, current episode mixed, severe with psychotic features"

and had been hospitalized five times in the past five years in connection with mental health

emergencies or issues.[16]  (*Id.*)  She further noted that Plaintiff had difficulty functioning due to

exacerbated mood swings and psychotic symptoms, notwithstanding regular follow-ups and

compliance with medication, which included Trileptal, Risperdal, Hydroxyzine, and Wellbutrin

SR.  (*Id.*)  Dr. Poblaguyev opined that Plaintiff was "not able to work due to his chronic serious

mental illness."  (*Id.*)  On May 2, 2018, Dr. Poblaguyev co-signed a letter[17] noting that Plaintiff

had "had multiple psychiatric hospitalizations and [emergency room] visits due to

decompensation" and that, at the time of the letter, Plaintiff needed continued treatment,

medication management, and therapy.  (*Id.* at 1362–63.)  The letter opined that Plaintiff's

prognosis was poor, his psychiatric condition was chronic, and that he was unable to work.  (*Id.* at

1363.)

     In determining Plaintiff's RFC, the ALJ gave only "partial weight"[18] to Dr. Poblaguyev's

December 2016 and May 2018 opinions, finding that "they are not consistent with the record that

---

[16] The record further indicates that, after Dr. Poblaguyev's December 12, 2016 letter,
Plaintiff was hospitalized again in April 2017 and February 2018 in connection with mental health
crises.  (*See id.* at 1364, 1618.)

[17] The letter was also signed by Lyudmila Gonik, LCSW, who had provided Plaintiff
mental health therapy treatment.  (*See id.* at 1363.)

[18] The ALJ also gave partial weight to the opinion of CE Carr, partial weight to the opinion
of state consultant H. Rozelman, Ph.D., and little weight to the 2013 opinion of Howard Forster,
M.D.  (Tr., Dkt. 8, at 39–41.)  Notwithstanding those physicians' varying opinions about the degree
of Plaintiff's mental limitations, the ALJ came to her own independent conclusion that Plaintiff
could perform a full range of work at all exertional levels, with some limitations.

reflects exacerbation of symptoms and episodes of decompensation only in the context of non-compliance." (*Id.* at 40; *see also id.* ("While one can infer a high degree of difficulty based upon [Dr. Poblaguyev's] opinion that [Plaintiff] is unable to work, . . . the longitudinal evidence [] indicates that medication alleviates symptoms when [Plaintiff] is compliant with it.").)  The ALJ also relied on the fact that Plaintiff declined injectable medication and psychotherapy for a period of time, and that Plaintiff had expressed an interest in working.  Notably, the ALJ does not evaluate the factors outlined in 20 C.F.R. §§ 404.1527(c)(1)–(6).  The Court finds that the ALJ failed to give good reasons for not giving Dr. Poblaguyev's opinion controlling weight.

First, Dr. Poblaguyev's opinions are based on, and consistent with treatment notes in the record, as discussed above.  Second, the Court does not find that noncompliance with medication therapy constitutes a good reason for not according controlling weight to Dr. Poblaguyev's opinion.  "[T]reatment noncompliance is common among individuals diagnosed with bipolar I disorder." *Rozanski v. Berryhill*, No. 17-CV-1904 (MPS), 2019 WL 276205, at *4 (D. Conn. Jan. 22, 2019) (citation omitted); *see also id.* ("During a manic episode, individuals often do not perceive that they are ill and vehemently resist efforts to be treated." (alterations omitted)).  The ALJ does not appear to have considered the possibility, if not likelihood, that any failure by Plaintiff to take his medication is *part* of the symptomatology for his disorders, nor does the ALJ address Plaintiff's reports that he had stopped taking the medication because it had stopped working.  (*See* Tr., Dkt. 8, at 1473, 1487.)  Furthermore, contrary to the ALJ's conclusion, Dr. Poblaguyev noted that Plaintiff's symptoms persist despite compliance with medication.  (*See id.*at 1325, 1361, 1443; *see also id.* at 229 (Plaintiff noting the same), 238 (same).)  And while Plaintiff's psychiatric treatment records give *some* indication that medication *sometimes* improved his symptoms (*see*, *e.g.*, *id.* at 1310), there is "no medical basis for the ALJ's conclusion that [these]

medication[s] sufficiently manage[d] Plaintiff's [bipolar disorder and schizophrenia] to a degree where he [could] perform work-related functions."   *See Collins v. Berryhill*, No. 16-CV-6673 (PKC), 2018 WL 259282, at \*7 (E.D.N.Y. Jan. 2, 2018) (citing *Gross v. Astrue*, No. 12-CV-6207P (MWP), 2014 WL 1806779, at \*18 (W.D.N.Y. May 7, 2014)).

Finally, the Court finds the ALJ's reliance on Plaintiff's interest in finding a job to be error. An interest in finding a job does not equate to the ability to obtain and keep one.  Plaintiff noted that he would prefer to work if he could, even though he had applied for SSI (Tr., Dkt. 8, at 1515), but the record contains no evidence that he was successful in obtaining a job after his alleged onset date.[19]  Indeed, Dr. Poblaguyev noted that Plaintiff "tried to go [] study to work in [real estate], but was not able to remember and focus[,] and started to realize that he ha[d] mental illness which interferes with his functioning."  (*Id.* at 1325–26.)

Given the insufficiency of the ALJ's analysis in discounting Dr. Poblaguyev's opinion, the Court finds remand warranted to allow the ALJ to accord Dr. Poblaguyev's opinion proper weight pursuant to the treating physician rule.

### B.  Plaintiff's Self-Reported Functioning

"The ALJ must follow a two-step process to evaluate a claimant's assertions of pain and other symptoms."  *Cabassa v. Astrue*, No. 11-CV-1449 (KAM), 2012 WL 2202951, at \*13 (E.D.N.Y. June 13, 2012).  "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ

---

[19] Plaintiff worked for four months in 2015, prior to his alleged onset date.  (*See id.* at 210–22, 813.)

must consider 'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (alteration omitted) (citing 20 C.F.R. § 404.1529(a)).

At the second step, the ALJ

> must consider statements the claimant or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts at work, or any other relevant statements [he] makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in [] administrative proceedings.

*Villegas Andino v. Comm'r of Soc. Sec.*, No. 18-CV-1780 (PKC), 2019 WL 4575364, at *5 (E.D.N.Y. Sept. 19, 2019) (quoting *Genier*, 606 F.3d at 49); *see also* 20 C.F.R. § 404.1512(b)(3).

At the hearing, Plaintiff testified:

> I hear voices all the time.  I see horrible images all the time.  I have horrible panic attacks.  I feel like the walls are caving in on me from—at times.  I see horrible things.  I see the ground coming up from underneath me.  I have visions of drowning.  I have visions of burning in fire, horrible thing.

(Tr., Dkt. 8, at 229.)  He further testified that medication had not helped with the hallucinations, despite having been treated by two psychiatrists.  (*Id.*)  With respect to daily activities, Plaintiff explained that he lived with his mother, who did the cooking and the house chores, and that he "[didn't] do much, [he] just sit[s] there.  [He]'ll try to watch TV from time to time, [he] cr[ies] a lot and that's about it." (*Id.* at 234.)  Plaintiff further testified:

> I can't function as a normal human being anymore.  I can't—I can't concentrate.  I can't remember things.  I can't read.  I can't—I can't—these voices won't leave me alone and the images that I see and the panic attacks that I get, I can't function as a normal human being anymore.

(*Id.* at 251.)

The ALJ summarized her assessment of Plaintiff's subjective statements as follows:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity,

21

> persistence and limiting effects of these symptoms are not entirely consistent with
> the medical evidence and other evidence in the record.

(*Id.* at 33 (record citation omitted).)

In so concluding, the ALJ relied on Plaintiff's daily activities, reasoning that the record noted Plaintiff engaged in activities such as "reading, watching television, playing online poker, [] spending time with family[,] . . . taking walks, exercising at home and at the gym, running errands, and helping his mother with household chores." (*Id.* at 38.) The ALJ also found Plaintiff's testimony "that he [was] unable to read" to be "not entirely consistent with treatment records." (*Id.* (record citation omitted).)  Notwithstanding Plaintiff's testimony (*id.* at 229, 238) and the opinions of Dr. Poblaguyev (*id.* at 1361), the ALJ concluded that medication seemed to help with Plaintiff's symptoms and that Plaintiff's intense symptomatology occurred only during non-compliance with the medication (*id.* at 38–39 (noting that "[Plaintiff] indicated that medications alleviated his symptoms, such that he was able to cope with voices and even sought employment or volunteer work opportunities.").)  As examples, the ALJ found that "the record indicates that psychiatric hospitalizations . . . occurred in the context of non-compliance with medication, and [] [Plaintiff]'s condition improved in the hospital shortly after doctors gave him medication." (*Id.*) The ALJ also pointed out that, notwithstanding the advice by his treating psychiatrist Dr. Poblaguyev, Plaintiff resisted for some time injectable medication and individual psychotherapy. (*Id.*)

In discounting Plaintiff's hearing testimony, the ALJ did not explain how Plaintiff's self-reported symptoms were inconsistent with Dr. Poblaguyev's treatment notes relating to Plaintiff, and failed to refer to or discuss Dr. Poblaguyev's letters and psychiatric assessment.  As discussed above, the record, in fact, is consistent with Plaintiff's statements concerning the symptoms of his disorders, and the Court does not find that Plaintiff's purported non-compliance with medication

22

(given his diagnosed bipolar and other mental disorders) constitutes substantial evidence supporting the ALJ's decision to disregard Plaintiff's self-reported symptoms.  And with respect to Plaintiff's limited daily activities, "[a]n individual can perform each of these daily activities and still experience" the limitations he claims.  *Larsen v. Astrue*, No. 12–CV–414 (CBA), 2013 WL 3759781, at *3 (S.D.N.Y. July 15, 2013).  "The Second Circuit has repeatedly recognized that '[a] claimant need not be an invalid to be found disabled.'"  *Colon v. Astrue*, No. 10-CV-3779 (KAM), 2011 WL 3511060, at *14 (E.D.N.Y. Aug. 10, 2011) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)).  "Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves."  *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014) (internal quotation and citations omitted).

In sum, the ALJ not only failed to reconcile conflicting evidence with regard to Plaintiff's mental functioning, as documented by his treating psychiatrist and discussed in the step-three analysis *supra*, but the ALJ failed to give proper consideration to the treating-physician factors, *i.e.*, the factors an ALJ is required to consider in deciding what weight to give the opinions of a claimant's treating physician, as required by 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6). Nor did the ALJ properly examine the treating physicians' opinions in light of Plaintiff's self-reported functioning.  For those reasons, remand is warranted.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion.   The Commissioner's decision is remanded for further consideration consistent with this Memorandum and Order.   The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.


SO ORDERED.


*/s/ Pamela K. Chen*_____
Pamela K. Chen
United States District Judge

Dated: September 30, 2020
       Brooklyn, New York